

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-19-00269-CR

———————————————————

TYRIN RELIFORD, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 211th District Court
Denton County, Texas
Trial Court No. F17-1012-158

---

Before Sudderth, C.J.; Gabriel and Bassel, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

### I. Introduction

Appellant Tyrin Reliford appeals his conviction for murder and his thirty-year sentence. *See* Tex. Penal Code Ann. § 19.02. In two points, Appellant argues that the evidence is insufficient to support the jury's verdict that he was the individual who shot Christian Chapman and that the trial court abused its discretion by admitting the contents of the text messages contained in State's Exhibit 27 because they were not authenticated and constituted inadmissible hearsay. Because we hold that the evidence is sufficient to show that Appellant was the shooter and that Appellant forfeited any error in the admission of State's Exhibit 27 by failing to object when the substance of that evidence came in elsewhere, we affirm.

### II. Factual Background

#### A. The Murder

Shortly before 11 p.m. on February 11, 2017, K.B., who was thirteen years old at the time, heard "weird noises" that "sounded . . . soft, but [like] gunshots" as she and her family exited their car near their apartment in Building 7 of the Wellington Park Apartments in Lewisville. She then saw a car hit a parked car that belonged to one of her neighbors.

When police arrived shortly thereafter, they saw blood on the driver's face, noted that he had a gunshot wound to the head, found shell casings in his lap and on the floorboard, and determined that he was dead. The autopsy revealed that the

2

victim had sustained eight gunshot wounds, including multiple gunshot wounds to the chest.

The lanyard hanging on the rearview mirror contained an employee identification badge for Christian Chapman. One of the officers asked the dispatchers to run a criminal history check on Chapman to see if he had any identifying scars, marks, or tattoos; that history showed that he had tattoos on his hands. The tattoos on the victim's hands led police to conclude that the victim was Chapman. Police noted that Chapman was seated in the vehicle in a position in which his arm was resting on the center console and that underneath his hand was a plastic bag containing "a bunch of pills."

When the police interviewed Chapman's family members, they learned that he had lived in Frisco with his mother, that he had recently been released from prison, that he had been dealing marijuana and ecstasy, that he owed money to people, and that he was affiliated with the Crips gang.

### B. The Description of the Man Who Had Left the Scene

When police interviewed K.B., she said that she had seen a black man with "dreads" coming towards her and her parents; he was coming from near the cars that were involved in the crash. K.B. estimated that she was probably around 5'2" or 5'3" at the time of the incident and that the man who had come toward her that night was

5'5" because he was taller than she was.[1]   K.B. saw the man for only a few seconds because after seeing her and her family, he changed direction and ran "back to the right."

## C. The Search of Chapman's Car

In addition to the two shell casings that police initially saw in Chapman's lap and on the floorboard, a search of his car revealed four other shell casings and three bullets—all of which were collected for forensic testing.  Police also found four cell phones in Chapman's car and collected them.  Fingerprints were lifted from the hood of the vehicle; none were found on the passenger side door or the passenger seat belt.[2]

## D. The Search of Chapman's Phones Connects Him to Appellant

Data extracted from Chapman's main cell phone showed that the last contact he had prior to his death was to arrange a marijuana exchange at Building 7 of the Wellington Park Apartments.  Detective Scott Kelly, who served as the lead detective on the case, explained that the texts on Chapman's phone mentioned the name "Tytianna" as the person who had introduced Chapman to Appellant.  Detective Kelly said that there was a text from Tytianna to Chapman stating that she had given

---

[1]On cross-examination, K.B., who was fifteen at the time of the trial, testified that she could not remember how tall she was when she was thirteen.

[2]The fingerprints that were collected from the hood of Chapman's car matched a woman's that he had been romantically involved with.  No fingerprints or DNA connected Appellant to Chapman's car.

4

his name to an individual that she used to work with because he was looking for some marijuana and she believed that Chapman could help him out. Detective Kelly called the phone number ending in 9213, which was associated with the text from Tytianna, and Tytianna answered the phone.

Tytianna Johnson testified that she knew Appellant from when she had worked with him at Dairy Queen in 2015. After Appellant no longer worked at Dairy Queen, he and Tytianna kept in touch over Snapchat.

Tytianna said that on February 11, 2017, Appellant messaged her on Snapchat and asked if she knew of anyone who sold marijuana. Tytianna knew that Chapman sold marijuana, so she told Chapman that someone she had previously worked with wanted some marijuana, and Chapman said to give the person his number. Tytianna complied by giving Chapman's phone number to Appellant. After Tytianna got home from work on February 11, she reached out to Appellant on Snapchat, but he had blocked her.

Detective Kelly testified that based on the texts found on Chapman's phone, Appellant had contacted Chapman to purchase a "zip," which is an ounce of marijuana, and had requested to meet Chapman at the Wellington Park Apartments. Chapman had asked for the specific address. Detective Kelly testified that based on the phone activity, it appeared that Chapman and Appellant met at the Wellington Park Apartments because Chapman texted, "Hey, I'm about 15 minutes away. Okay?"

5

Detective Kelly testified that during a separate misdemeanor investigation, which occurred a couple of weeks after the murder investigation, he obtained Appellant's contact information from his family, and the phone number (ending in 8805) that they provided for Appellant matched the phone number that showed up in Chapman's phone during the "drug-setup-to-purchase incident." Detective Kelly called the phone number and was placed on speaker phone, so he spoke with Appellant and another individual. To narrow down whether the phone number corresponded to Appellant, Detective Kelly asked Appellant whose phone he was using, and he said that it was his phone.

### E. Appellant Detained for Questioning and Cell Phones Confiscated

An officer stopped Appellant in March 2017 because he was wanted for questioning on several offenses. As a result of the traffic stop, the arresting officer collected a couple of cell phones from Appellant.

### F. The Search of Appellant's Phones Shows that He Had Sought out a Gun

Detective Kelly testified that the results of the forensic examination of Appellant's phones did not show the text messages regarding purchasing a zip,[3] but the results let him know that there was another individual that he needed to speak with—Tavahn Dunlap. Appellant's text messages with Dunlap were about a .40-caliber Glock 27.

---

[3]Detective Kelly opined that those text messages had been deleted.

6

The evidence reflected that Appellant's main phone had received two photos of a Glock pistol from a phone number ending in 4270 that was listed in the contacts as "TC."[4]  Additionally, Appellant's phone contained text messages from 6:29 p.m. on January 30, 2017, through 12:33 p.m. on January 31, 2017, between Appellant and the 4270 number associated with TC.  Appellant initiated the conversation, asking, "Where da straps?"  Detective Shawn Dority, who testified about the data extracted from Appellant's phone, explained that based on his training and experience, "straps" refers to a firearm.  TC responded, "What's craccin' . . . shit what u lookin' for, clean or dirty," which Detective Dority translated as follows:  "What kind of gun are you looking for, stolen or legitimately purchased?"  Appellant responded, "Don't matter." At first TC texted, "My boy got a .45 Glock, 275," but later he said, "I lied.  It's a .40."  Appellant asked if it was a Glock 27, and TC replied, "Yuh."  The two then texted amounts, which Detective Dority interpreted as negotiations regarding the price of the gun.  The following day, TC texted Appellant to ask if he still needed the gun, and Appellant responded, "Yuh.  I gotta cash dis check at 9."  The final response from TC was that the gun's owner was at work and would contact him on his break so that TC could go get the gun.

Dunlap testified at trial that he had first met Appellant when he had taken his kids to play at Old Orchard Park.  Appellant had approached Dunlap while he was

_____

[4]Dunlap explained that he was known as Twin Cities or TC because he grew up in St. Paul, Minnesota.

smoking, they had talked about tattoos, and they had exchanged phone numbers. Dunlap admitted that many people had his phone number, which ended in 4270, because he was known as someone who could "get things for people."

When Appellant asked for a gun, Dunlap told him that he could get that for him. Dunlap texted pictures of the gun to Appellant. Dunlap testified that he had loaned Appellant a .40-caliber Glock with the hope that he would purchase it from him because he needed money to pay for daycare. Dunlap said that Appellant came to his home and picked up the gun. Dunlap told Appellant that he needed either the gun or the money for the gun in his car by Friday.[5] Dunlap testified that Appellant returned the gun by placing it in the center console in Dunlap's car the night before Dunlap pawned the gun. Dunlap did not know that the gun had been used in a crime, but he knew that Appellant had wanted to make some quick money and needed the gun for protection.

---

[5]It appears that Dunlap was confused as to what day he needed the gun returned. Dunlap testified that Appellant had the gun for only about twenty-four hours, and the evidence shows that the murder occurred on February 11, 2017—which the calendar for 2017 reflects was a Saturday—and that the gun was pawned the following day—which was a Sunday. *See* Tex. R. Evid. 201 (permitting judicial notice of a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned), 204(b)(1) (permitting court to take judicial notice on its own); *see, e.g.*, *Ex parte Carson*, 215 S.W.3d 921, 923 n.3 (Tex. App.—Texarkana 2007, no pet.) (taking judicial notice of the calendar for 2006).

8

The evidence at trial demonstrated that Dunlap sold the gun to Legacy Pawn around 11 a.m. on February 12, 2017. Detective Kelly tracked down the gun, and the buyer brought it to the police department.

## G. The Search of Appellant's Main Phone Reveals Two Phone Calls with Chapman

Detective Dority testified that he searched for any calls on Appellant's phone involving the phone number ending in 6558, which was Chapman's phone number. There were two incoming calls on Appellant's phone from the 6558 number on February 11, 2017: one at 10:49 p.m. that lasted twenty-four seconds and one at 10:52 p.m. that lasted three minutes and forty-two seconds.

## H. Results of the Testing on the Casings, Projectiles, and Gun

Detective Kelly testified that the six casings all contained the same headstamp; they were all .40-caliber ammunition manufactured by Perfecta. Detective Kelly explained that because the shell casings and projectiles were all from the same brand and were all of the same caliber, he was confident that they had been fired from the same gun.

The same conclusion was reached by Kevin Callahan, a firearms and toolmark examiner with the Texas Department of Public Safety Crime Laboratory who analyzed the six cartridge cases, the three bullets, and the Glock pistol. Callahan testified that the six cartridge cases had the following class characteristics: they were .40-caliber Smith & Wesson, they were fired from the same unknown firearm, and

9

they could have been fired from a Glock or a Smith & Wesson. Callahan testified that of the three projectiles, one was damaged, which prevented him from making a positive identification. But he concluded that the other two projectiles contained substantial individual marks for him to conclude that they had been fired from the same unknown firearm. Callahan analyzed the Glock pistol, which he said was a Glock 27, Generation 4 that fired .40-caliber Smith & Wesson ammunition. Callahan compared "test-fires" from the Glock pistol to the bullets and cartridge cases that had been recovered and concluded that all six of the cartridge cases and all three of the bullets had been fired "from this particular firearm."

## I. Other Suspect Ruled Out

Detective Kelly testified that Dewayne Franklin was initially the number one suspect because he is a Lewisville resident who is a member of the Bloods gang, is known to hang out at the Wellington Park Apartments, and has physical descriptors and a hairstyle similar to the description that K.B. provided—a young black male with dreads. Detective Kelly said that Franklin was not a suspect after Detective Kelly spoke with him and learned other information that supported that Appellant was responsible for Chapman's death. Detective Kelly testified that he was able to corroborate the reliability of the information that he had obtained from Franklin by continuing the investigation.

Detective Kelly put together a photographic lineup that was shown to K.B. and her family, but they did not identify Franklin. Detective Kelly ruled out Franklin

10

because he was not picked out of the photographic lineup. During the defense's case in chief, Appellant recalled Detective Kelly to testify regarding the comments that K.B.'s father made when he saw Franklin in the photo lineup, "His lips are too thick, but he kind of looks like him."

After "much time had elapsed," K.B. and her family were shown a second lineup that included Appellant, who is six feet tall, but they did not identify him as the suspect. Detective Kelly said that he does not put a lot of confidence in photo lineups and that even if Appellant had been picked out of the photo lineup, he would not rely specifically on the identification from the photo lineup but would need to "have other affirmative links to the case."

### J. Detective Kelly's Theory of the Case

Detective Kelly testified that he could not rule out the possibility that Dunlap and Franklin were at the scene of the murder but that the evidence did not show that anyone other than Appellant was at the scene and that K.B.'s family saw only one person running from the victim's car. Detective Kelly testified that the gun confirmed his theory of the case: Appellant had requested that Chapman come to the Wellington Park Apartments on February 11, 2017, just before 11:00 p.m.; Chapman was shot at numerous times with a Glock 27, .40-millimeter firearm at the Wellington Park Apartments around 11:00 p.m.; and through his investigation, Detective Kelly had learned that Appellant was the person in possession of that gun at the time of

11

Chapman's murder. Detective Kelly thus concluded that Appellant was the person responsible for Chapman's death.

### K.  Trial Outcome

After hearing the above evidence, the jury agreed with Detective Kelly's theory of the case and found Appellant guilty. The jury assessed Appellant's punishment at thirty years' confinement, and the trial court sentenced him in accordance with the jury's recommendation.

## III.  Sufficient Evidence Supports Conviction

In his first point, Appellant argues that the evidence is insufficient to support the jury's verdict that he was the individual who had shot Chapman on February 11, 2017. Appellant contends that the physical description of Chapman's murderer does not match him and that no witness identified him as the suspect, that no physical evidence tied him to the crime scene or to the gun, and that the evidence "overwhelmingly pointed to someone other than Appellant as the killer."

### A.  Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable

12

inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49. Moreover, the standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016).

## B. Applicable Law

A person commits murder if he intentionally or knowingly causes the death of an individual or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. Tex. Penal Code Ann. § 19.02(b)(1)–(2).

13

## C. Analysis

Appellant's first insufficiency argument that the evidence is insufficient to show that he was the shooter stems from the physical description given by K.B. Appellant argues that because he is six feet tall and because K.B.'s family did not pick him out of the photo lineup, the evidence is insufficient. K.B. was thirteen years old at the time of the incident and saw the man only for a few seconds before he ran off; thus, it was understandable that she might not be able to pinpoint the man's exact height. Moreover, the remainder of her description was not challenged—that the man who had left the scene was black, had dreadlocks, and was taller than she was. With regard to K.B.'s family's inability to identify Appellant in the photo lineup, the lead detective testified that he does not put a lot of confidence in the identifications made during photo lineups. The jury as the factfinder was entitled to weigh the evidence and K.B.'s credibility and decided not to exclude Appellant as a suspect solely because of K.B.'s inaccurate description of his height and the inability to identify him in the photo lineup. We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622.

Appellant's second insufficiency argument contends that there is no physical evidence that tied him to the crime scene or to the gun. Specifically, Appellant argues that the evidence is insufficient to show that he shot Chapman because no fingerprints or DNA tied him to Chapman's car or to the gun. The State, however,

14

was not required to put on direct evidence to prove that Appellant was the shooter. *See Jenkins*, 493 S.W.3d at 599 (stating that circumstantial evidence is as probative as direct evidence in establishing guilt). As set forth in detail above and as summarized below, the circumstantial evidence introduced by the State is sufficient to support the verdict.

In his final insufficiency argument, Appellant contends that the evidence "overwhelmingly pointed" to Franklin as the shooter. The jury heard evidence that Franklin was initially a prime suspect because he met the physical description provided by K.B. and was known to hang out at the Wellington Park Apartments. When K.B. and her family were shown the photo lineup that included Franklin, they did not identify him as the man at the scene; they noted that he kind of looked like the suspect but that "[h]is lips [were] too thick." Detective Kelly ultimately ruled out Franklin as a suspect because he was not identified in the photo lineup, because Detective Kelly had spoken with Franklin, and because other information—including the text messages between Appellant and Dunlap about the .40-caliber Glock and the timing of Dunlap's loaning the Glock to Appellant—had come to light during the investigation and had pointed to Appellant rather than to Franklin. As explained above, the jury, as the factfinder, had the duty to weigh the evidence and to act as the sole judge of the witnesses' credibility; again, we may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622.

Reviewing the evidence in the light most favorable to the verdict, the record demonstrates the following:

- Appellant reached out to Tytianna on Snapchat on February 11 to find someone who would sell him marijuana, and she gave Appellant Chapman's number.

- Appellant texted Chapman to purchase marijuana and set up the location for the drug buy: Building 7 at the Wellington Park Apartments in Lewisville.

- Chapman texted Appellant when he was 15 minutes away.

- Chapman and Appellant had two phone conversations at 10:49 p.m. and 10:52 p.m. on February 11.

- Shortly before 11 p.m., K.B. heard "weird noises" that "sounded soft, but [like] gunshots" near Building 7 at the Wellington Park Apartments and then saw a car hit a neighbor's car.

- Chapman was found in the vehicle that had hit the neighbor's car in the parking lot near Building 7.

- One black man with dreads was seen leaving the area.

- The casings and projectiles found in Chapman's vehicle were fired from a .40-caliber Glock 27.

16

- Appellant had borrowed a .40-caliber Glock 27 from Dunlap shortly before the murder and had returned it to Dunlap less than twelve hours after the murder.

- The police tracked down the .40-caliber Glock 27 that Appellant had borrowed from Dunlap.

- The ballistics testing showed that the casings and projectiles found in Chapman's vehicle were fired from the .40-caliber Glock 27 that Appellant had borrowed from Dunlap.

- Appellant blocked Tytianna from communicating with him on Snapchat after she had connected him with Chapman.

- It appeared that Appellant had deleted the text messages that he had sent to and had received from Chapman but had failed to delete the call logs showing the two phone calls with Chapman shortly before 11 p.m. on February 11.

While each circumstance of guilt considered in isolation is insufficient to prove that Appellant was the shooter, when all of the evidence is viewed in the light most favorable to the verdict and when the cumulative force of all the admitted evidence and reasonable inferences that can be drawn therefrom are considered, we conclude that the evidence is sufficient to show that Appellant shot Chapman. *See Ingerson v. State*, 559 S.W.3d 501, 511 (Tex. Crim. App. 2018) (holding circumstantial evidence

17

sufficient to identify appellant as the shooter); *Clayton v. State*, 235 S.W.3d 772, 779–82 (Tex. Crim. App. 2007) (holding that a rational juror could find beyond a reasonable doubt that appellant was responsible for killing victim based on reasonable inferences from and the cumulative force of the incriminating circumstantial evidence presented). Accordingly, we hold that the evidence is sufficient to support Appellant's conviction for murder. *See Clayton*, 235 S.W.3d at 782. We overrule Appellant's first point.

## IV. Admission of the Challenged Text Messages Was Harmless

In his second point, Appellant argues that the trial court abused its discretion by admitting the contents of the text messages contained in State's Exhibit 27 because they were not properly authenticated. Alternatively, Appellant argues that the trial court abused its discretion by admitting the contents of the text messages contained in State's Exhibit 27 because they constituted inadmissible hearsay.

### A. Standard of Review

We review a trial court's evidentiary rulings under an abuse-of-discretion standard. *See Jenkins*, 493 S.W.3d at 607. A trial court's decision is an abuse of discretion only when it falls outside the zone of reasonable disagreement. *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007). An evidentiary ruling will be upheld if it is correct on any theory of law applicable to the case. *Gonzalez v. State*, 195 S.W.3d 114, 126 (Tex. Crim. App. 2006).

18

## B. Applicable Law

We have previously set forth the law on the need for continuous objections:

> To preserve error, a party must continue to object each time the objectionable evidence is offered. A trial court's erroneous admission of evidence will not require reversal when other such evidence was received without objection, either before or after the complained-of ruling. This rule applies whether the other evidence was introduced by the defendant or the State.

*Clay v. State*, 361 S.W.3d 762, 767 (Tex. App.—Fort Worth 2012, no pet.) (quoting *Sikes v. State*, No. 02-10-00029-CR, 2011 WL 4711998, at *6 (Tex. App.—Fort Worth Oct. 6, 2011, pet. ref'd) (mem. op. on reh'g, not designated for publication)). Moreover, preservation of error is a systemic requirement that this court should review on its own motion. *Darcy v. State*, 488 S.W.3d 325, 327–28 (Tex. Crim. App. 2016).

## C. What the Record Shows

On the second day of the trial, during the testimony of Jonathan Hay who had forensically analyzed the data on Chapman's phone, the State sought to introduce State's Exhibit 27, which consists of a chart with text messages extracted from Chapman's phone. Those text messages are shown in reverse chronological order on State's Exhibit 27, which is reproduced below, and reflect Tytianna's involvement in connecting Appellant and Chapman, as well as the details setting up the marijuana sale:

19

STATE'S EXHIBIT

27

PENGAD 800-631-6989

| # | Folder | From/To | Date/Time | Network | Number | Status | Message |
|---|--------|---------|-----------|---------|--------|--------|---------|
| 11 | Inbox | From +19404427805 Laylaa* | 2/12/2017 12:08:29 AM(UTC-6) | Network: 2/12/2017 12:08:27 AM(UTC-6) | +120631300 56 | Unread | |
| 12 | Inbox | From +14696180151 Shatara* | 2/11/2017 11:28:34 PM(UTC-6) | Network: 2/11/2017 11:28:33 PM(UTC-6) | +120631300 57 | Unread | |
| 13 | Inbox | From +19404427805 Laylaa* | 2/11/2017 11:12:39 PM(UTC-6) | Network: 2/11/2017 11:12:37 PM(UTC-6) | +140547200 57 | Unread | |
| 14 | Inbox | From +12147188805 | 2/11/2017 10:52:16 PM(UTC-6) | Network: 2/11/2017 10:52:13 PM(UTC-6) | +140547200 56 | Read | Wya |
| 15 | Inbox | From +12147188805 | 2/11/2017 10:48:04 PM(UTC-6) | Network: 2/11/2017 10:48:01 PM(UTC-6) | +140547200 56 | Read | Wya |
| 16 | Inbox | From +12147188805 | 2/11/2017 10:33:40 PM(UTC-6) | Network: 2/11/2017 10:33:38 PM(UTC-6) | +120631300 57 | Read | What car you in |
| 17 | Sent | To +12147188805 | 2/11/2017 10:32:53 PM(UTC-6) | | | Sent | 15 mins away |
| 18 | Sent | To +12144146052 Raven* | 2/11/2017 10:31:17 PM(UTC-6) | | | Sent | |
| 19 | Inbox | From +12147188805 | 2/11/2017 9:57:30 PM(UTC-6) | Network: 2/11/2017 9:57:27 PM(UTC-6) | +140547200 57 | Read | Bet |
| 20 | Sent | To +12147188805 | 2/11/2017 9:55:58 PM(UTC-6) | | | Sent | Give me bout an hour. Cool? |
| 21 | Inbox | From +12147188805 | 2/11/2017 9:52:31 PM(UTC-6) | Network: 2/11/2017 9:52:29 PM(UTC-6) | +140547200 55 | Read | Building 7 |
| 22 | Inbox | From +12147188805 | 2/11/2017 9:51:13 PM(UTC-6) | Network: 2/11/2017 9:51:11 PM(UTC-6) | +140547200 56 | Read | 2479 deer run Lewisville tx |
| 23 | Sent | To +12147188805 | 2/11/2017 9:47:50 PM(UTC-6) | | | Sent | Wats the address |
| 24 | Inbox | From +12147188805 | 2/11/2017 9:47:41 PM(UTC-6) | Network: 2/11/2017 9:47:38 PM(UTC-6) | +140547200 57 | Read | Wya |
| 25 | Sent | To +12147188805 | 2/11/2017 9:47:39 PM(UTC-6) | | | Sent | Wats the address |
| 26 | Inbox | From +12147188805 | 2/11/2017 9:46:07 PM(UTC-6) | Network: 2/11/2017 9:46:05 PM(UTC-6) | +140547200 56 | Read | Wellington |
| 27 | Sent | To +12147188805 | 2/11/2017 9:45:41 PM(UTC-6) | | | Sent | I got u. Wya |
| 28 | Inbox | From +12147188805 | 2/11/2017 9:45:02 PM(UTC-6) | Network: 2/11/2017 9:44:56 PM(UTC-6) | +140547200 55 | Read | Damn you can't do 210 |
| 29 | Inbox | From +12144146052 Raven* | 2/11/2017 9:44:57 PM(UTC-6) | Network: 2/11/2017 9:44:55 PM(UTC-6) | +140547200 57 | Read | |
| 30 | Sent | To +12147188805 | 2/11/2017 9:44:02 PM(UTC-6) | | | Sent | 225 |
| 31 | Inbox | From +12147188805 | 2/11/2017 9:43:33 PM(UTC-6) | Network: 2/11/2017 9:43:32 PM(UTC-6) | +140547200 55 | Read | How much? |
| 32 | Sent | To +12147188805 | 2/11/2017 9:42:29 PM(UTC-6) | | | Sent | Yea |
| 33 | Inbox | From +12147188805 | 2/11/2017 9:41:24 PM(UTC-6) | Network: 2/11/2017 9:41:23 PM(UTC-6) | +140547200 57 | Read | Aye you got a zip I got your number from tytianna |
| 34 | Inbox | From +14696180151 Shatara* | 2/11/2017 9:40:39 PM(UTC-6) | Network: 2/11/2017 9:40:35 PM(UTC-6) | +120631300 55 | Unread | |
| 35 | Inbox | From +12144939213 | 2/11/2017 9:39:41 PM(UTC-6) | Network: 2/11/2017 9:39:39 PM(UTC-6) | +120631300 56 | Unread | He about to text you. |

2219

20

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 36 | Inbox | From +12144939213 | 2/11/2017 9:37:11 PM(UTC-6) | Network: 2/11/2017 9:37:10 PM(UTC-6) | +120631300 56 | Read | Or you know where he can get a zip |
| 37 | Inbox | From +12144939213 | 2/11/2017 9:36:39 PM(UTC-6) | Network: 2/11/2017 9:36:38 PM(UTC-6) | +120631300 56 | Read | Hey I got this dude I used to work with he wanna know if you got a Zip? |
| 38 | Inbox | From +12545891898 | 2/11/2017 9:05:04 PM(UTC-6) | Network: 2/11/2017 9:05:02 PM(UTC-6) | +140547200 57 | Read | |
| 39 | Sent | To +12545891898 | 2/11/2017 9:04:41 PM(UTC-6) | | | Sent | |
| 40 | Inbox | From +12545891898 | 2/11/2017 9:04:27 PM(UTC-6) | Network: 2/11/2017 9:04:24 PM(UTC-6) | +120631300 57 | Read | |
| 41 | Sent | To +12545891898 | 2/11/2017 9:02:51 PM(UTC-6) | | | Sent | |
| 42 | Inbox | From +12545891898 | 2/11/2017 9:02:24 PM(UTC-6) | Network: 2/11/2017 9:02:23 PM(UTC-6) | +120631300 55 | Read | |
| 43 | Sent | To +12545891898 | 2/11/2017 9:01:52 PM(UTC-6) | | | Sent | |
| 44 | Inbox | From +12545891898 | 2/11/2017 9:01:32 PM(UTC-6) | Network: 2/11/2017 9:01:30 PM(UTC-6) | +140547200 57 | Read | |
| 45 | Sent | To +12545891898 | 2/11/2017 9:01:17 PM(UTC-6) | | | Sent | |
| 46 | Inbox | From +12545891898 | 2/11/2017 8:59:54 PM(UTC-6) | Network: 2/11/2017 8:59:52 PM(UTC-6) | +140547200 56 | Read | |
| 47 | Sent | To +12545891898 | 2/11/2017 8:58:12 PM(UTC-6) | | | Sent | |
| 48 | Sent | To +12545891898 | 2/11/2017 8:56:52 PM(UTC-6) | | | Sent | |
| 49 | Inbox | From +12545891898 | 2/11/2017 8:56:13 PM(UTC-6) | Network: 2/11/2017 8:56:11 PM(UTC-6) | +120631300 55 | Read | |
| 50 | Sent | To +12545891898 | 2/11/2017 8:54:35 PM(UTC-6) | | | Sent | |
| 51 | Sent | To +18324848292 Brijette* | 2/11/2017 8:52:25 PM(UTC-6) | | | Sent | |
| 52 | Sent | To +19727488712 Aj* | 2/11/2017 8:52:07 PM(UTC-6) | | | Sent | |
| 53 | Inbox | From +14696180151 Shatara* | 2/11/2017 8:48:56 PM(UTC-6) | Network: 2/11/2017 8:48:55 PM(UTC-6) | +120631300 55 | Read | |
| 54 | Sent | To +14696180151 Shatara* | 2/11/2017 8:48:31 PM(UTC-6) | | | Sent | |
| 55 | Inbox | From +14696180151 Shatara* | 2/11/2017 8:47:46 PM(UTC-6) | Network: 2/11/2017 8:47:44 PM(UTC-6) | +120631300 55 | Read | |
| 56 | Sent | To +14696180151 Shatara* | 2/11/2017 8:47:14 PM(UTC-6) | | | Sent | |
| 57 | Inbox | From +14696180151 Shatara* | 2/11/2017 8:46:55 PM(UTC-6) | Network: 2/11/2017 8:46:53 PM(UTC-6) | +120631300 57 | Read | |
| 58 | Sent | To +14696180151 Shatara* | 2/11/2017 8:46:20 PM(UTC-6) | | | Sent | |
| 59 | Inbox | From +14696180151 Shatara* | 2/11/2017 8:45:11 PM(UTC-6) | Network: 2/11/2017 8:45:08 PM(UTC-6) | +140547200 55 | Read | |
| 60 | Sent | To +14696180151 Shatara* | 2/11/2017 8:44:50 PM(UTC-6) | | | Sent | |
| 61 | Inbox | From +14696180151 Shatara* | 2/11/2017 8:43:19 PM(UTC-6) | Network: 2/11/2017 8:43:17 PM(UTC-6) | +120631300 55 | Read | |
| 62 | Sent | To +14696180151 Shatara* | 2/11/2017 8:42:21 PM(UTC-6) | | | Sent | |

2220

At trial, Appellant objected to the admission of State's Exhibit 27 based on hearsay, the Confrontation Clause, and lack of authentication. The trial court overruled Appellant's objections. Hay then read aloud the texts in State's Exhibit 27, gave the date and time that they were received, and noted whether the texts had been read by Chapman—all without objection.

During the prior day of trial, the State had questioned Detective Kelly about the data that was found during the forensic analysis of Chapman's cell phone:

> *Q.* At some point, did you get the data back from Mr. Chapman's cell phone?
>
> *A.* We did.
>
> *Q.* And was there anything in particular that you were looking for on that cell phone?
>
> *A.* There was.
>
> *Q.* What was that?
>
> *A.* The very last contact that he had had using his phone prior to his death.
>
> *Q.* Okay. And what was the nature of that very last contact?
>
> *A.* It looked like it was to arrange for a marijuana exchange.
>
> *Q.* And where was that marijuana exchange to take place?
>
> *A.* At 2479 Deer Run by Building 7.
>
> *Q.* Is that the Wellington Park Apartments?
>
> *A.* It is.

*Q.* And is any name mentioned in that exchange at the beginning?

*A.* There is, yes.

*Q.* And what name is that?

*A.* Tytianna.

*Q.* Did that interest you?

*A.* It did.

*Q.* How come?

*A.* Because she now has, I believe, intimate knowledge of what happened -- or what led up to what happened the night of this incident.

*Q.* Why do you think that? What about that text message made you believe that Tytianna kind of knew what had happened?

*A.* Because she's the one that did the introductions between [Appellant] and Chris Chapman.

*Q.* And is that apparent from those text messages?

*A.* It is.

*Q.* In fact, you know, the text to Mr. Chapman says, "Tytianna gave me your phone number"?

*A.* It did.

. . . .

*Q.* Okay. Did that Tytianna person also text Mr. Chapman?

*A.* She did, yes.

*Q.* And what was the nature of that text?

23

*A.* She was basically saying, Hey, I gave your name and number to an individual that I used to work with. He's looking for some marijuana. If you can help him out, help him out, basically.

*Q.* Okay. And did you call that number that that text message came from?

*A.* I did.

*Q.* And who answered the phone?

*A.* It was Tytianna Johnson.

. . . .

*Q.* And, I guess, did you talk to her?

*A.* I did. Several times.

*Q.* Did she cooperate with your investigation?

*A.* She did.

*Q.* Okay. And did it bear out that she had indeed made the introduction between the two -- the two gentlemen?

*A.* It did.[6]

. . . .

---

[6]The State questioned Detective Kelly about how Tytianna had communicated with Appellant, and he said, "She claimed it was through her Snapchat account." When Detective Kelly attempted to explain his understanding of how long messages stay on Snapchat and whether people would be reassured that the messages automatically delete, Appellant objected to each answer based on speculation, and the trial court sustained both of his objections. Because this information about Snapchat was not part of the text messages that were obtained from Chapman's phone, we exclude it from the testimony set forth above but note it here to show that Appellant made only two objections to this portion of Detective Kelly's testimony.

*Q.* Okay. Now, you have the phones -- or Mr. Chapman's phone, at least.

And through the interviews that you had done with different people, were you looking for something in particular on the phone, on Mr. Chapman's phone?

*A.* In particular, how so?

*Q.* In regards to the marijuana sale.

*A.* Oh, yes. I wanted to know if he was buying or selling.

. . . .

*Q.* Did looking at his phone illuminate whether or not he was buying or selling marijuana?

*A.* It did.

*Q.* What was he doing?

*A.* He was selling.

*Q.* Okay. And had [Appellant] contacted him looking to purchase marijuana?

*A.* Yes, sir.

. . . .

*Q.* And what did he say?

*A.* Hi. You got a zip?

. . . .

*Q.* Now, could you tell from that conversation who had chosen the Wellington Park Apartments as a meeting place between [Appellant] and Mr. Chapman?

*A.* I could.

*Q.* Who had requested to meet there?

*A.* That was going to be [Appellant].

*Q.* Would that be consistent with your prior investigation as far as Mr. Chapman's knowledge of the Lewisville area?

*A.* Correct.

*Q.* Why?

*A.* Because he asked where it was. I mean, he even specifically asked, What's the address?

. . . .

*Q.* Now, did it appear as though Mr. Chapman and [Appellant] did meet at the Wellington Park Apartments based on the phone activity?

*A.* It did, yes.

*Q.* Why?

*A.* Because Mr. Chapman said, Hey, I'm about 15 minutes away. Okay?

And then there's an actual phone conversation between the two phones.

. . . .

*Q.* So how close to 11:00 p.m. did that phone call take place?

*A.* 10:52 p.m. So eight minutes till eleven.

*Q.* So that would be consistent with a phone call that would occur very shortly in time prior to the shooting?

*A.* Correct.

26

## D. Analysis

Here, Appellant forfeited any error to the admission of State's Exhibit 27. As set forth above, the day before State's Exhibit 27 was admitted into evidence, Detective Kelly testified about the text messages that were found on Chapman's cell phone, including the texts from Tytianna and Appellant. This is substantively the same evidence that is contained in State's Exhibit 27, which uses only phone numbers. Yet, Appellant did not object to Detective Kelly's more detailed testimony about the text messages on Chapman's phone. Appellant also did not object when Hay read the texts aloud from State's Exhibit 27. In light of the unobjected-to testimony from Detective Kelly and Hay, we conclude that Appellant forfeited his authentication and hearsay objections to State's Exhibit 27. *See Clay*, 361 S.W.3d at 767 ("[B]ecause Wallace provided testimony about the Louisiana records without objection before and after appellant's objection to the admission of the records and because appellant failed to obtain a running objection, we conclude that he forfeited his objection to the records' admission." (footnote omitted)); *see also Jones v. State*, No. 06-15-00119-CR, 2016 WL 3197397, at *5 (Tex. App.—Texarkana June 9, 2016, no pet.) (mem. op., not designated for publication) ("Smuts testified about the results of the DNA laboratory report. Therefore, we find that Jones waived his . . . complaints regarding the admission of the DNA report."). We overrule Appellant's second point.

27

## V.  Conclusion

Having overruled Appellant's two points, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  February 27, 2020